# United States Tax Court

160 T.C. No. 2

MICHAEL JOHNSON AND CYNTHIA JOHNSON, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 19973-18, 19975-18, 19978-18, 20001-18.

Filed January 25, 2023.

————

Ps in these consolidated cases are shareholders in E, an S corporation that claimed an energy efficient commercial building property (EECBP) deduction for tax year 2013, pursuant to I.R.C. § 179D(a). E contracted with a federal government entity, the VA, to supply and install components of a federal building's heating, ventilation, and air conditioning system. To do so, personnel from E analyzed existing technical programming specifications, modified them as necessary, and then programmed the modified specifications into new, installed components. Upon E's request, the VA building's chief maintenance officer signed a letter that agreed, pursuant to I.R.C. § 179D(d)(4), to allocate to E the full amount of the I.R.C. § 179D deduction to which the VA would otherwise be entitled for the installation of the property.

————

[1] Cases of the following petitioners are consolidated herewith: Brant Lieske and Laura Lieske, Docket No. 19975-18; Scott Lieske, Docket No. 19978-18; and Todd Lieske, Docket No. 20001-18.

*Held:* The installed property at issue in these cases was EECBP within the meaning of I.R.C. § 179D(c)(1).

*Held, further*, the chief officer of maintenance and operations at the VA building properly allocated the available amount of an I.R.C. § 179D deduction to E as the person primarily responsible for designing the EECBP.

*Held, further*, the installed property at issue in these cases was placed in service in tax year 2013.

*Held, further*, E is entitled to an I.R.C. § 179D deduction of $304,640.

––––––––––

*Matthew S. Reddington, Selina A. Billington, John H. Dies, Jeremy M. Fingeret, Rosalind J. Lewis*, and *Jefferson H. Read*, for petitioners.

*Jonathan E. Behrens* and *Kerrington A. Hall*, for respondent.

NEGA, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' federal income tax and accuracy-related penalties under section 6662(a) as follows:[2]

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Michael Johnson and Cynthia Johnson, Docket No. 19973-18

| Year | Deficiency | Penalty § 6662(a) |
|---|---|---|
| 2013 | $200,827 | $40,165.40 |
| 2014 | 456 | — |

Brant Lieske and Laura Lieske, Docket No. 19975-18

| Year | Deficiency | Penalty § 6662(a) |
|---|---|---|
| 2013 | $62,607 | $12,521.40 |

Scott Lieske, Docket No. 19978-18

| Year | Deficiency | Penalty § 6662(a) |
|---|---|---|
| 2013 | $59,317 | $11,863.40 |
| 2014 | 3,045 | — |

Todd Lieske, Docket No. 20001-18

| Year | Deficiency | Penalty Sec. 6662(a) |
|---|---|---|
| 2013 | $58,668 | $11,733.60 |
| 2014 | 1,720 | — |

The deficiencies in these consolidated cases arise from respondent's disallowance of a section 179D deduction claimed by Edwards

Engineering, Inc. (Edwards), for the 2013 taxable year.[3] Petitioners are, directly or indirectly, shareholders of Edwards and reported their proportionate shares of the claimed section 179D deduction on their individual tax returns. After concessions,[4] the issue for decision is whether Edwards is entitled to a deduction of $1,073,237 under section 179D for the 2013 taxable year.

## FINDINGS OF FACT

On March 1, 2021, these cases were tried during a Chicago, Illinois, remote trial session of the Court. The following facts are drawn from the pleadings, the Stipulation of Facts and the Exhibits attached thereto, and testimony and Exhibits from trial. At the time of the filing of each Petition in these consolidated cases, each petitioner resided in Illinois.

I.    *Edwards*

Edwards was incorporated in the State of Illinois on October 11, 1978. Edwards is in the business of designing and installing heating, ventilation, and air conditioning (HVAC) systems and process systems and is a licensed engineering firm in the State of Illinois. Edwards employs several professional engineers who are licensed in the State of Illinois as well as other states.

For the 2013 taxable year Edwards was a small business corporation within the meaning of section 1361(b)(1) and had an election in effect to be treated as an S corporation for federal income tax purposes. In 2013 petitioners Michael Johnson, Brant Lieske, Todd Lieske, and Scott Lieske owned, individually or as beneficiaries of trusts, all the shares of Edwards. At all relevant times during the 2013 taxable year, Michael Johnson was a 50% shareholder; the Brant Lieske Investment Trust was a 16.667% shareholder, the beneficiary of which was Brant Lieske; the Scott Lieske Investment Trust was a 16.667% shareholder, the beneficiary of which was Scott Lieske; and the Todd Lieske Investment Trust was a 16.667% shareholder, the beneficiary of

---

[3] The deficiencies respondent determined against petitioners Michael Johnson and Cynthia Johnson, Scott Lieske, and Todd Lieske for the 2014 taxable year arose from the disallowance of prior year minimum tax credits claimed with respect to the alternative minimum tax reported for the 2013 taxable year.

[4] Respondent conceded that petitioners are not liable for an accuracy-related penalty under section 6662(a) for tax year 2013.

which was Todd Lieske.[5]  In March 2012, Edwards entered into a contract (maintenance contract) with the U.S. Department of Veterans Affairs (VA), a federal government entity, to provide maintenance services with respect to the HVAC systems at the Edward Hines, Jr. VA Hospital (Hines VA).

## II.  *The Edward Hines, Jr. VA Medical Center*

Hines VA is a hospital located in Hines, Illinois.  At all relevant times, Hines VA was owned by the VA.  During 2013 and 2014 Michael J. McCrary was the Chief of Maintenance and Operations at Hines VA and was involved with the procurement of goods and services for Hines VA.

The Hines VA campus comprises several buildings, the largest of which is Building 200, the building at issue in these cases.  Building 200 is the main hospital and comprises 15 floors, an occupied basement, a pipe basement, and multiple mechanical roof penthouses.  Building 200 is a critical health care facility and all building systems must be operational and functional at all times.

## III.  *The Projects at Hines VA*

Under the maintenance contract, Edwards was to "furnish all labor, material, tools, equipment and parts necessary to complete the inspection, testing, maintenance, repair and emergency services as required for the temperature control systems and devices."  The maintenance contract applied to several buildings on the Hines VA campus, including Building 200.

A general overview of commercial HVAC systems, such as those in Building 200, might be helpful.  They are highly complicated in comparison to residential HVAC systems.  A commercial HVAC system is made up of numerous mechanical components, including air handlers, chillers, cooling towers, water pumps, and air volume systems.  The control system is the "brains" of an HVAC system and controls every component in the HVAC system.  In a commercial HVAC system, the

---

[5] At all relevant times the Brant Lieske Investment Trust, the Scott Lieske Investment Trust, and the Todd Lieske Investment Trust were grantor trusts.  Under the terms of those trusts, Brant Lieske, Scott Lieske, and Todd Lieske each reported the income from their respective trusts on Schedules E, Supplemental Income and Loss, of their Forms 1040, U.S. Individual Income Tax Return, for the 2013 taxable year.

control system is usually a direct digital control system, which consists of a front-end computer, controllers or actuators that control every component, and a series of sensors that measure variables in the building such as temperature, humidity, and pressure. In general, there are four aspects of control that integrate into a system: (1) digital inputs, which are control point switches that start and stop components; (2) digital outputs, which output information from the system into the front-end computer; (3) analog inputs, which vary current or voltage to modulate valves, dampers, and motors; and (4) analog outputs, which feed back to the front-end computer temperature and pressure measurements from the sensors. The communications of the control systems are called the sequence of operations. To achieve automation, a sequence of operations, which is essentially the logic-based order of events that the system cycles through in order to accomplish a particular task (e.g., if temperature drops below 50 degrees, then turn on heating component), is programmed into the front-end computer to tell the system how to operate.

Edwards maintained a full-time staff at Hines VA to perform the services required under the maintenance contract. The Edwards employees primarily responsible for providing services at the Hines VA campus were Robert Paul and Ron Carpenter. Mr. Paul's position at Edwards was in business promotion in the government sector, and he was responsible for the overall project management at Hines VA. Mr. Carpenter was the site supervisor at Hines VA acting on behalf of Edwards. Mr. Carpenter was an experienced HVAC technician, with certifications in various automated HVAC control systems, including Johnson Controls control systems.

A.    *S4/S5 Air Handling Units Project*

In or around September 2013, Hines VA requested that Edwards provide a quote for replacing the control systems for the S4/S5 air handling units in Building 200. At that time the existing American Auto-Matrix control systems that served the S4/S5 air handling units and several other floors had become obsolete, and the system was not functioning properly. The existing system also operated as a standalone system, so its front-end computer was accessible only from a single physical location in Building 200 and not via Hines VA's computer system. These issues were compounded by the fact that there was a problem with communication with the service provider representative for the American Auto-Matrix control system. During its inspection of the existing systems, Edwards also found that a pump and a valve

actuator were missing. On September 9, 2013, Edwards provided a quote to Hines VA for the replacement of the control systems for the S4/S5 air handling units.

Pursuant to a contract modification effective September 6, 2013, the maintenance contract was modified to increase funding by $99,990 to update the control systems for the S/4/S/5 air handling units in Building 200 (S4/S5 air handling units project). The statement of work for the S4/S5 air handling units project called for Edwards to "furnish all labor, materials, tools, and equipment and parts necessary to replace the existing Control systems operating S/4/S/5 air handling units and install new Johnson Controls Building automation system." On September 20, 2013, Mr. Paul signed the contract modification on behalf of Edwards to proceed with work on the S4/S5 air handling units project.

Edwards purchased the equipment for the S4/S5 air handling units project from South Side Control Supply Co. (South Side). South Side is a control and parts distributor for commercial HVAC contractors and is primarily in the business of selling replacement parts and components for commercial HVAC systems. Edwards also retained South Side to assist with the programming of the Johnson Controls control system and to provide printed drawings for the replacement of the control system because it had the software to produce the drawings.

In order to perform the work for the S4/S5 air handling units project, Edwards obtained the technical information for the existing system, including control prints, mechanical prints, and floor plans. Edwards also obtained the original sequence of operations for the existing mechanical systems in Building 200, conducted a full assessment of the existing system, and modified the sequence of operations as necessary.[6] As part of the S4/S5 air handling units project, Edwards installed the new Johnson Controls control system equipment and sensors and replaced the missing pump and actuator. Mr. Carpenter and Dave Moravec, an employee for South Side, worked together to program a modified sequence of operations into the front-end computer for the Johnson Controls control system. To ensure that the Johnson Controls control system was integrated and properly functioning, Mr. Carpenter put every aspect of the system through a

---

[6] The original sequence of operations for the existing system was designed by PFB Architects, LLC, and KJWW Engineering Consultants in 2009 or 2010 as part of previous HVAC upgrade work for Building 200.

series of simulation tests and reprogrammed any components not found to be within specifications.

Edwards employees logged a total of 594.5 hours with respect to the S4/S5 air handling units project, of which 155 hours were logged during January 2014 and the remainder during 2013. On January 31, 2014, Edwards issued an invoice for $99,990 to the VA for the S4/S5 air handling units project. On or about June 11, 2014, Edwards received a payment from the VA of $99,990.

B.     *Emergency Replacement of Temperature Control Systems*

In or around September 2013, Hines VA requested that Edwards provide a quote for an emergency replacement of the temperature control systems for floors 5, 6, 7, and 8 of Building 200. At the time, the front-end computer for the existing control system related to those floors was malfunctioning. As mentioned above, the American Auto-Matrix controls for those systems had become obsolete and either could not be replaced or required Hines VA to hire a specific service provider, who had proven to be unreliable. Rather than replace the front-end computer, Hines VA decided to replace the entire control system related to those floors of Building 200. During its inspection of the existing system, Edwards also determined that the isolation rooms, which isolate a patient to avoid cross-contamination with other patients, were not functioning. On September 27, 2013, Edwards provided a quote to Hines VA for the removal of the existing American Auto-Matrix control system and installation of new Johnson temperature control systems for floors 5, 6, 7, and 8 of Building 200.

Edwards and the VA entered into a contract, effective September 27, 2013, for the emergency replacement of the temperature control systems for floors 5, 6, 7, and 8 of Building 200 (emergency temperature control systems project). The statement of work for the emergency temperature control systems project called for Edwards to "furnish all labor, tools, materials, installation, transportation, maintenance, and emergency repair services, necessary to remove [the American Auto-Matrix control system] and install new [Johnson Controls] temperature controls on floors 5, 6, 7, and 8 of Building 200." On September 27, 2013, the VA issued to Edwards a notice to proceed with the work on the project. Pursuant to the notice to proceed, the period of performance for the contract was not to exceed 30 days and was to be completed by October 27, 2013.

As with the S4/S5 air handling units project, Edwards purchased the equipment for the emergency temperature control system project from South Side and retained South Side to assist with the programming of the Johnson Controls control system. Edwards analyzed the original sequence of operations for the existing mechanical systems in Building 200, inspected the existing system, and modified the sequence of operations as necessary. As part of the emergency temperature control systems project, Edwards installed the new Johnson Controls control system equipment, sensors, and communication cable and added controls and different pressure sensors in the nonfunctioning isolation rooms. Mr. Carpenter and Mr. Moravec programmed the modified sequence of operations into the front-end computer for the Johnson Controls control system.

Edwards employees logged a total of 522 hours on the emergency temperature control systems project, of which 88 hours were logged during January 2014 and the remainder during 2013. On October 31, 2013, Edwards issued two invoices to the VA totaling $4,640 for the emergency temperature control systems project. On or about October 31, 2013, Edwards received a payment of $4,640 from the VA. On January 31, 2014, Edwards issued a third invoice to the VA for $200,000 for the emergency temperature control systems project. On or about March 5, 2014, Edwards received a payment of $200,000 from the VA.

C. *Subcontractor Purchase Orders and Invoices for the Projects*

On September 30 and November 21, 2013, Edwards issued purchase orders to South Side totaling $25,209.84 for the S4/S5 air handling units project. On October 28, 2013, and January 17 and November 1, 2014, South Side issued invoices to Edwards totaling $22,007.09. On January 10, May 1, and December 26, 2014, Edwards paid the South Side invoices.

On September 30, 2013, Edwards issued a purchase order for $123,942 to South Side for the emergency temperature control systems project. On April 22, 2014, South Side issued an invoice for $123,942 to Edwards. On June 24, 2014, Edwards paid the South Side invoice. On October 4, November 13, November 20, and December 20, 2013, Edwards issued purchase orders to the Cable Co. totaling $1,495.56 for the emergency temperature control systems project. On October 2, November 15, November 20, and December 23, 2013, the Cable Co.

issued invoices to Edwards. On December 3, 2013, and March 4, 2014, Edwards paid the Cable Co. invoices.

IV. *Energy Efficient Commercial Building Tax Deduction Study*

Edwards engaged Alliantgroup, LP (Alliantgroup), to conduct an Energy Efficient Commercial Building Tax Deduction Study (study) for the 2013 taxable year with respect to Building 200. Alliantgroup is a tax consultancy and lobbying firm, which, inter alia, maintains a section 179D deduction group that specializes in qualifying and certifying energy efficient commercial building properties.

On November 15, 2013, Jennifer Marilley, a senior associate director at Alliantgroup, sent Mr. Johnson an allocation letter and requested that Edwards have Mr. McCrary sign the allocation letter "as soon as possible." Edwards provided the allocation letter to Mr. McCrary, who signed it on December 17, 2013, on a signature line labeled "Signature (VA Representative)." The allocation letter stated, in relevant part, that "the owner of the Building allocates the full federal income tax deduction available under Section 179D attributable to the HVAC and hot water systems to Edwards Engineering, Inc., for their work on the Building." Attached to the allocation letter was a table which stated, inter alia, the placed in service date and the cost of the property installed in Building 200 with respect to the projects at issue.

After obtaining the allocation letter, Alliantgroup proceeded with conducting the study. Adam Goldberg, an employee of Alliantgroup and a professional engineer licensed in the State of Illinois, performed the energy modeling with respect to Building 200. On March 27, 2014, Stephen Siirtola, an employee of Alliantgroup, performed the field inspection and prepared a Site Inspection Summary Form. On March 27, 2014, Mr. Goldberg completed and signed a certificate of compliance related to Building 200 of Hines VA. The certification of compliance stated, inter alia, (1) that "[t]he total annual energy and power costs of this building have been reduced by more than 50 percent due to the installation of the above named systems;" (2) that "[a] qualified individual has field inspected the property after it has been placed in service and confirms that the building has met, or will meet, the energy-saving targets contained in the design plans and specifications, and that the field inspections, were performed in accordance with any inspection and testing procedures that (1) have been prescribed by the National Renewable Energy Laboratory as Energy Saving Modeling and Inspection Guidelines for Commercial Building Federal Tax Deductions,

and (2) were in effect at the time of certification;" and (3) that "[t]he building owner has received an explanation of the energy efficiency features of the building and its projected annual energy costs." The certification of compliance also included a declaration under penalties of perjury by Mr. Goldberg.

On August 11, 2014, Alliantgroup sent a letter to Hines VA, addressed to Mr. McCrary, regarding the study. The letter informed Hines VA that Alliantgroup had completed the study for Building 200 and determined that Edwards has been allocated a section 179D deduction in the amount of $1,037,237. The letter also provided the projected annual energy costs for Building 200 and a list of the energy efficient features installed in Building 200, which included "Efficient Air Handling Units," "Energy Recovering Units," and "Centrifugal Chillers."

## V. *Tax Returns, Notices of Deficiency, and Petitions*

On September 15, 2014, Edwards filed a Form 1120S, U.S. Income Tax Return for an S Corporation, for the 2013 taxable year, claiming a section 179D deduction of $1,073,237. Petitioners, as direct or indirect shareholders of Edwards, reported their proportionate shares of the claimed section 179D deduction on their Forms 1040 for the 2013 taxable year. By notices of deficiency dated July 12, 2018, respondent disallowed the section 179D deduction claimed by each petitioner.

On October 11, 2018, petitioners in each of these consolidated cases filed Petitions commencing the cases at Docket Nos. 19973-18, 19975-18, 19978-18, and 20001-18. By Order issued February 25, 2019, these cases were consolidated for the purpose of pretrial discovery, motion practice, trial, briefing, and opinion.

OPINION

## I. *Jurisdiction and Burden of Proof*

Where a notice of deficiency issued to an S corporation shareholder includes adjustments to both S corporation items and other items unrelated to the S corporation, we have jurisdiction to determine the correctness of all adjustments in the shareholder-level deficiency proceeding. *See Winter v. Commissioner*, 135 T.C. 238, 245–46 (2010); *see also Deckard v. Commissioner*, 155 T.C. 118, 132 n.12 (2020); *Hacker v. Commissioner*, T.C. Memo. 2022-16, at *20. We thus have jurisdiction to determine the correctness of respondent's adjustments to petitioners'

proportionate shares of Edwards's claimed section 179D deduction and other adjustments in the notices of deficiency.

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Moreover, deductions are a matter of legislative grace, and the taxpayer generally bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). A taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is allowable pursuant to some statutory provision and must substantiate the deduction by maintaining and producing records sufficient to enable the Commissioner to determine the taxpayer's correct tax liability. § 6001; *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); Treas. Reg. § 1.6001-1(a).

VI.     *The Section 179D Deduction*

A.     *Governing Statutory Provisions*

Section 179D provides a deduction with respect to energy efficient commercial buildings. Ordinarily, when a taxpayer incurs expenses for improvements to buildings or other property, the taxpayer is required to capitalize the expenditures and may recover the costs over time through deductions for depreciation or amortization. *See* §§ 167, 168, 263. Section 179D instead allows taxpayers an immediate deduction with respect to energy efficient commercial building property.

Section 179D(a) provides that "[t]there shall be allowed as a deduction an amount equal to the cost of energy efficient commercial building property placed in service during the taxable year."[7] For

---

[7] As originally enacted in 2005, section 179D applied to property placed in service after December 31, 2005, and before January 1, 2008. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 1331(a), (d), 119 Stat. 594, 1020, 1024. The Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, div. A, § 204, 120 Stat. 2922, 2945, extended the section 179D deduction to apply to property placed in service before January 1, 2009. The Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, div. B, § 303, 122 Stat. 3765, 3845, further extended the section 179D deduction to apply to property placed in service before January 1, 2014. Congress has since made section 179D permanent. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. EE, § 102(a), 134 Stat. 1182, 1860 (2020).

purposes of section 179D, section 179D(c)(1) defines "energy efficient commercial building property" (EECBP) as property:

> (A) with respect to which depreciation (or amortization in lieu of depreciation) is allowable,
> (B) which is installed on or in any building which is—
>> (i) located in the United States, and
>> (ii) within the scope of Standard 90.1-2001,[8]
> (C) which is installed as part of—
>> (i) the interior lighting systems,
>> (ii) the heating, cooling, ventilation, and hot water systems, or
>> (iii) the building envelope, and
> (D) which is certified in accordance with subsection (d)(6) as being installed as part of a plan designed to reduce the total annual energy and power costs with respect to the interior lighting systems, heating, cooling, ventilation, and hot water systems of the building by 50 percent or more in comparison to a reference building which meets the minimum requirements of Standard 90.1-2001 using methods of calculation under subsection (d)(2).

With respect to determining the energy and power costs, section 179D(d)(2) directs that "[t]he Secretary, after consultation with the Secretary of Energy, shall promulgate regulations which describe in detail methods for calculating and verifying energy and power consumption and cost, based on the provisions of the 2005 California Nonresidential Alternative Calculation Method Approval Manual." Section 179D(d)(3)(A) requires that any calculation under paragraph (2) be prepared by qualified computer software.[9]

---

[8] Standard 90.1-2001 means Standard 90.1-2001 of the American Society of Heating, Refrigeration, and Air Conditioning Engineers and the Illuminating Engineering Society of North America (as in effect on April 2, 2003). § 179D(c)(2).

[9] Pursuant to section 179D(d)(3)(B), the term "qualified computer software" means software (1) for which the software designer has certified that the software meets all procedures and detailed methods for calculating energy and power consumption and costs as required by the Secretary; (2) which provides such forms as required to be filed by the Secretary in connection with energy efficiency of property and the deduction allowed under this section; and (3) which provides a notice form which documents the energy efficiency features of the building and its projected annual energy costs.

With respect to the certifications required under section 179D(c)(1)(D), section 179D(d)(6) directs that "[t]he Secretary shall prescribe the manner and method for the making of certifications under this section," which shall include "procedures for inspection and testing by qualified individuals described in subparagraph (C) to ensure compliance of buildings with energy-savings plans and targets."[10] § 179D(d)(6)(A) and (B). Additionally, section 179D(d)(5) provides that each certification required under this section must include an explanation to the building owner regarding the energy efficiency features of the building and its projected annual energy costs as provided in the notice under paragraph (3)(B)(iii).

In the case of EECBP installed on or in property owned by a federal, state, or local government or a political division thereof, section 179D(d)(4) provides that "the Secretary shall promulgate a regulation to allow the allocation of the deduction to the person primarily responsible for designing the property in lieu of the owner of such property." Pursuant to section 179D(d)(4), that person (i.e., the person primarily responsible for designing the property) "shall be treated as the taxpayer for purposes of this section."

Generally, if the requirements of section 179D(c)(1) are satisfied, the amount of the section 179D deduction allowed is equal to the cost of the EECBP placed in service during the taxable year.[11] § 179D(a). However, pursuant to section 179D(b), the deduction allowed is not to exceed the excess, if any, of the product of $1.80 and the square footage of the building, over the aggregate amount of the section 179D deductions taken with respect to the building for all prior taxable years. To the extent that a section 179D deduction is allowed with respect to any EECBP, the building owner is required to reduce the basis of the property by the amount of the deduction so allowed. § 179D(e).

B. *Legislative History*

The Energy Policy Act of 2005, § 1331(a), 119 Stat. at 1020, enacted section 179D of the Code. Before the enactment of section 179D,

---

[10] Pursuant to section 179D(d)(6)(C), individuals qualified to determine compliance shall be only those individuals who are recognized by an organization certified by the Secretary for such purposes.

[11] If the requirement of subsection (c)(1)(D) is not met, but the property is otherwise certified in accordance with subsection (d)(6) and any system referred to in subsection (c)(1)(C) satisfies the energy savings target established by the Secretary with respect to such system, subsection (d)(1) provides for a partial allowance.

no special deduction was provided for expenses incurred for EECBP. S. Rep. No. 108-54, at 33 (2003). The Senate Committee on Finance (Committee), reporting on a prior bill containing text that was ultimately enacted as section 179D (2003 report), described the reason for change as follows:[12]

> The Committee recognizes that commercial buildings consume a significant amount of energy resources and that reductions in commercial energy use have the potential to significantly reduce national energy consumption. Accordingly, the Committee believes that a special deduction for commercial building property (lighting, heating, cooling, ventilation, and hot water supply systems) that meets a high energy-efficiency standard will encourage construction of buildings that are significantly more energy efficient than the norm. The Committee further believes that the special deduction will encourage innovation to reduce the costs of meeting the energy-efficiency standard.

S. Rep. No. 108-54, at 33; *accord* H. Rep. No. 108-375, at 476–78 (2003) (Conf. Rep.); Staff of J. Comm. on Tax'n, 109th Cong., General Explanation of Tax Legislation Enacted in the 109th Congress, JCS-1-07, at 52–54 (J. Comm. Print 2007); Staff of J. Comm. on Tax'n, 109th Cong., Description and Technical Explanation of the Conference Agreement of H.R. 6, Title XIII, The "Energy Tax Incentives Act of 2005," JCX-60-05, at 78–81 (J. Comm. Print 2005).

We are mindful that a committee report of a previous Congress, discussing a bill with provisions different from those ultimately enacted into law, may not necessarily reflect the intent of a subsequent Congress. *See Commissioner v. Engle*, 464 U.S. 206, 222–23 (1984). Consequently, we do not attribute significant interpretive weight to the 2003 report in clarifying textual ambiguities in section 179D.

C.    *Interim Guidance*

Section 179D contains multiple delegations of rulemaking authority to the Secretary of the Treasury, but the Secretary has not yet promulgated any regulations with respect to section 179D. In the absence of such regulatory guidance, the Internal Revenue Service (IRS)

---

[12] *See* Energy Tax Incentives Act of 2003, S. 1149, 108th Cong. (2003).

has issued interim guidance in the form of various notices, which interpret the requirements for a section 179D deduction. I.R.S. Notice 2006-52, 2006-1 C.B. 1175, sets forth a process for obtaining a certification that the property satisfies the energy efficiency requirements of section 179D(c)(1)(D) and describes the methods for calculating and verifying energy and power cost and consumption. I.R.S. Notice 2008-40, 2008-1 C.B. 725, sets forth guidance interpreting the requirements for the allocation of section 179D deductions for government-owned buildings under section 179D(d)(4). The parties' dispute largely focuses on the proper reading of the Notices, and, in the analysis that follows, we similarly focus our attention on the Notices.[13]

VII. *Whether Edwards Is Entitled to a Section 179D Deduction for the 2013 Taxable Year*

Respondent disallowed in full the section 179D deduction Edwards claimed for the 2013 taxable year with respect to the purported EECBP installed in Building 200 of Hines VA. We must determine whether Edwards is entitled to a section 179D deduction for the 2013 taxable year. We note that the parties' dispute encompasses nearly every applicable requirement of section 179D.

A. *Energy Efficient Commercial Building Property*

Section 179D(c)(1) defines EECBP as depreciable property which is installed (1) on or in any building located in the United States and within the scope of Standard 90.1-2001 and (2) as part of the interior lighting systems, the heating, cooling, ventilation, and hot water systems, or the building envelope. § 179D(c)(1)(A)–(C). Additionally, the property must be

> certified in accordance with subsection (d)(6) as being installed as part of a plan designed to reduce the total annual energy and power costs with respect to the [relevant] systems of the building by 50 percent or more in comparison to a reference building which meets the

---

[13] Respondent does not contend that section 179D, which contains mandatory delegations of authority, cannot be effective in the absence of regulations. *See First Chi. Corp. v. Commissioner*, 842 F.2d 180, 182 (7th Cir. 1988), *aff'g* 88 T.C. 663 (1987); *cf. 15 W. 17th St. LLC v. Commissioner*, 147 T.C. 557, 573 (2016) (discussing discretionary delegations of authority).

minimum requirements of Standard 90.1-2001 using methods of calculation under subsection (d)(2).

§ 179D(c)(1)(D).

The parties do not dispute that the property at issue was depreciable property installed as part of the heating, cooling, ventilation, and hot water systems of Building 200, which is a building located in the United States and within the scope of Standard 90.1-2001. *See* § 179D(c)(1)(A)–(C). The parties, however, disagree as to whether the property Edwards installed in Building 200 also satisfied section 179D(c)(1)(D). Specifically, respondent argues that the requirements of section 179D(c)(1)(D) were not satisfied because (1) the property was not installed as part of a plan to achieve the energy savings target, (2) the computed energy savings were not derived from the property installed, and (3) the certification and notice to building owner required by section 179D(d)(5) and (6) were deficient. We disagree with respondent on each ground and conclude that the property Edwards installed in Building 200 qualifies as EECBP under section 179D(c)(1).

1.    *Installed as Part of a Plan*

Respondent contends that section 179D(c)(1)(D) requires the property at issue to have been installed within the context of a plan designed to achieve the energy savings target. Respondent argues that the "part of a plan" language in section 179D(c)(1)(D) requires both intent and specific forethought to achieve the energy savings target. Respondent asserts that the projects at issue were not the subject of forethought because they entailed emergency replacement of control systems. Respondent further asserts that the projects were not designed to achieve the energy savings target because they were exclusively aimed at achieving maintenance savings, improved data access, and improved repair services.

Petitioners, on the other hand, contend that "part of a plan" in section 179D(c)(1)(D) does not require subjective intent to achieve the energy savings target. Instead, petitioners assert that, when the statute is read in its full context, "part of a plan" merely reflects a certification requirement. Under petitioners' reading of the statute, section 179D(c)(1) and (d)(6) together require only that a qualified individual certify that the property was actually installed as promised and planned. Petitioners further point out that it is extremely rare for Congress to impose a subjective intent requirement for a tax incentive

and that respondent's own guidance omits any reference to such a requirement.

We need not decide which party has the better reading of the statutory text standing alone, because the plain text of Notice 2006-52 resolves the issue in petitioners' favor and respondent continues to stand by the Notice. Section 4 of the Notice expressly provides that "[a] certification will be treated as satisfying the requirements of § 179D(c)(1) if the certification contains all of the following." *See* Notice 2006-52, § 4, 2006-1 C.B. at 1177. The Notice then proceeds to set out what the certification must contain. *See id.* § 4.01–.09, 2006-1 C.B. at 1178. Nothing in the paragraphs that follow the quoted text requires a statement with respect to intent and forethought.[14] In the absence of such a requirement, we conclude that respondent has conceded that a certification containing just the information contemplated by Notice section 4.01 to 4.09 "will be treated as satisfying [all of] the requirements of § 179D(c)(1)," including the requirements of section 179D(c)(1)(D) (the provision on which respondent now relies). *See Rauenhorst v. Commissioner*, 119 T.C. 157, 169–73 (2002).

## 2. *Methods of Calculation and Computed Energy Savings*

Section 179D(c)(1)(D) requires that the property installed be "certified in accordance with subsection (d)(6) as . . . reduc[ing] the total annual energy and power costs with respect to the [relevant] systems of the building by 50 percent or more in comparison to a reference building which meets the minimum requirements of Standard 90.1-2001 using methods of calculation under subsection (d)(2)." As mentioned above, the Secretary has not promulgated regulations on the methods of calculation. *See* § 179D(d)(2) ("The Secretary, after consultation with the Secretary of Energy, shall promulgate regulations which describe in detail methods for calculating and verifying energy and power consumption and cost, based on the provisions of the 2005 California Nonresidential Alternative Calculation Method Approval Manual."). Notice 2006-52, however, sets forth interim guidance on the methods for calculating and verifying energy and power consumption and cost. *See* Notice 2006-52, § 3, 2006-1 C.B. at 1177.

---

[14] Nor for that matter does the Notice expressly or implicitly give any indication concerning any intent and forethought requirement.

Notice 2006-52, section 3.01 states that "[t]he Performance Rating Method (PRM) must be used to compute the percentage reduction in the total annual energy and power costs with respect to the combined usage of a building's [relevant] systems as compared to a Reference Building." To compute the percentage reduction, the PRM requires the creation of two energy models, a reference building model and a proposed building model. *Id.* § 3. The reference building is "a building that is located in the same climate zone as the taxpayer's building and is otherwise comparable to the taxpayer's building except that its interior lighting systems, heating, cooling, ventilation, and hot water systems, and building envelope meet the minimum requirements of Standard 90.1-2001."[15] *Id.* § 3.03. The proposed building is "a building that contains the interior lighting systems, heating, cooling, ventilation, and hot water systems, and building envelope that have been incorporated, or that the taxpayer plans to incorporate, into the taxpayer's building but that is otherwise identical to the Reference Building." *Id.* § 3.04(1). The percentage reduction in energy and power costs is computed by (1) subtracting the energy and power costs for the relevant components of the proposed building (proposed building energy and power costs) from the energy and power costs for the same components of the reference building (reference building energy and power costs) and (2) expressing the difference as a percentage of the reference building energy and power costs. *Id.* § 3.02.

Mr. Goldberg, a qualified individual within the meaning of section 179D(d)(6)(C) and Notice 2006-52, section 5.05, 2006-1 C.B. at 1179, performed the energy and power cost modeling with respect to Building 200. Pursuant to Notice 2006-52, section 3, Mr. Goldberg created a reference building model and a proposed building model for Building 200. The reference building model included the baseline standards for each building component from Standard 90.1-2001 and the PRM Appendix G of Standard 90.1-2004. The proposed building model included the HVAC systems that had been incorporated into Building 200 but was otherwise identical to the reference building. The variables for each building model were entered as inputs in the eQuest software and the software outputs represented the annual energy and power consumption of the reference building and the proposed building. The energy and power consumption for each building model were converted to energy costs by using the Department of Energy average fuel prices

---

[15] The energy performance of the reference building is determined by applying the methods for baseline building performance in the PRM Appendix G of Standard 90.1-2004. Notice 2006-52, § 3.03.

for electricity and natural gas. Using these calculations, Mr. Goldberg determined the proposed building energy and power cost to be \$436,810 and the reference building energy and power cost to be \$873,810, resulting in a 50.01% reduction in energy and power costs of Building 200. As a result, Mr. Goldberg certified that Building 200 satisfied the requisite energy savings under section 179D(c)(1)(D).

Respondent contends that, while petitioners have computed a reduction in energy costs that purports to satisfy the energy savings target, they have not established or otherwise verified that any of those computed energy savings resulted from the property Edwards installed in Building 200. Respondent instead argues that the computed energy savings rely exclusively on the property installed in Building 200 as part of the original HVAC upgrade in 2011 to achieve the energy savings target. Respondent asserts that, if the specific components not installed by Edwards are removed from the computed energy savings, Building 200 would fail to achieve the energy savings target. Respondent further argues that, in any event, the property Edwards installed in Building 200 had no associated energy savings because it was merely a replacement of one control system for another. We disagree.

Pursuant to Notice 2006-52, the percentage reduction in the total annual energy and power costs of a building is calculated by using a comparison between the proposed building and the reference building. The proposed building is broadly defined as containing the relevant systems "that have been incorporated, or that the taxpayer plans to incorporate," into the building. Notice 2006-52, § 3.04(1). Under this definition, the systems and components included in the proposed building are not limited to those incorporated into the building within a specific timeframe or by a specific contractor. Thus, in essence, Notice 2006-52 interprets section 179D(c)(1)(D) as contemplating a comparison between the proposed building as it stands and the reference building. Accordingly, we find that the proposed building in this case properly included all the HVAC systems and components that have been incorporated into Building 200.

Since the property incorporated into Building 200 reduced the total annual energy and power costs with respect to the relevant systems of the proposed building by 50% or more in comparison to those of the reference building, the requirements of section 179D(c)(1)(D) and Notice 2006-52 have been met.

### 3. *Certifications and Notice to Building Owner*

Before a taxpayer may claim a section 179D deduction with respect to property installed on or in a commercial building, the taxpayer must obtain a certification with respect to the property. Notice 2006-52, § 4, 2006-1 C.B. at 1177. Section 179D(c)(1)(D) requires that EECBP be "certified in accordance with subsection (d)(6)." Section 179D(d)(6) directs that "[t]he Secretary shall prescribe the manner and method for the making of certification under this section" and "shall include as part of the certification process procedures for inspection and testing by qualified individuals . . . to ensure compliance of buildings with energy-savings plans and targets." § 179D(d)(6)(A) and (B). Section 179D(d)(5) further requires each certification to include an explanation to the building owner regarding the energy efficiency features of the building and its projected annual energy costs.

Notice 2006-52, section 4 prescribes the manner and method for the making of certifications in accordance with section 179D(c)(1) and (d)(6). Pursuant to Notice 2006-52, section 4, a certification will be treated as satisfying the requirements of section 179D(c)(1) if the certification contains, inter alia:

> .05 A statement by the qualified individual that field inspections of the building performed by a qualified individual after the property has been placed in service have confirmed that the building has met, or will meet, the energy-saving targets contained in the design plans and specifications, and that the field inspections were performed in accordance with any inspection and testing procedures that (1) have been prescribed by the National Renewable Energy Laboratory (NREL) as Energy Savings Modeling and Inspection Guidelines for Commercial Building Federal Tax Deductions and (2) are in effect at the time the certification is given.

> .06 A statement that the building owner has received an explanation of the energy efficiency features of the building and its projected annual energy costs.

> . . . .

> .08 A list identifying the components of the [relevant] systems, and building envelope installed on or in

the building, the energy efficiency features of the building, and its projected annual energy costs.

Respondent contends that the certification and the notice to building owner in this case do not satisfy the requirements of section 179D(d)(5) and (6) and Notice 2006-52, section 4. Specifically, respondent asserts that the certification and the notice to building owner are deficient because they do not list the energy efficient features of Building 200. Respondent further asserts that the field inspection was not performed in accordance with NREL procedures because the site inspection summary form does not contain information that would enable someone to verify that the projects complied with the mandatory provisions of Standard 90.1-2001. We disagree on both grounds.

Mr. Goldberg provided Edwards the certification of compliance, dated March 27, 2014, with respect to Building 200. Attached to Mr. Goldberg's certification was a list of the components of the HVAC system installed in Building 200, which included air handling units, heating coils, and variable frequency drive pumps. Similarly, the notice to building owner, dated August 11, 2014, provided a list of the energy efficient features installed in Building 200, which included efficient air handling units, energy recovering units, and centrifugal chillers. At trial Mr. Goldberg credibly testified:

> In some cases, energy-efficient features will be separate functions or operational characteristics of the energy-efficient components, but in other cases, those components and those features are interchangeable. And so when they speak . . . to energy-efficient components, energy-efficient features, there is overlap there, that this can account for both clauses of that statement.

We agree with Mr. Goldberg that, in this case, the components installed in Building 200 also represent the energy efficient features of Building 200. Accordingly, we find that the certification and the notice to building owner in this case listed both the components and energy efficient features of Building 200.

With respect to the field inspection, respondent correctly points out that one of the two objectives of the NREL inspection and testing procedures is to "[v]erify that the energy efficient properties qualifying for the tax deductions in the taxpayer's building meet the necessary mandatory provisions of Standard 90.1-2001." M. Deru, Technical

Report NREL/TP-550-40467, *Energy Savings Modeling and Inspection Guidelines for Commercial Building Federal Tax Deductions* 10 (2d ed. May 2007), https://www.nrel.gov/docs/fy07osti/40467.pdf. Notice 2006-52, section 4.05, however, does not expressly require the field inspection certification itself to contain information that would enable someone to verify that the projects complied with the mandatory provisions of Standard 90.1-2001. Instead, Notice 2006-52, section 4.05 requires only that the certification include "[a] statement by the qualified individual . . . that the field inspections were performed in accordance with any inspection and testing procedures that (1) have been prescribed by the [NREL] as Energy Savings Modeling and Inspection Guidelines for Commercial Building Federal Tax Deductions and (2) are in effect at the time the certification is given." Mr. Siirtola, a qualified individual within the meaning of Notice 2006-52, sections 4 and 5.05, performed the field inspection with respect to Building 200 on March 27, 2014. On the site inspection summary form, dated March 27, 2014, Mr. Siirtola indicated that the projects (1) complied with the mandatory provisions of Standard 90.1-2001 and (2) matched the provided construction drawings, including controls. Furthermore, a statement in the certificate of compliance for Building 200 satisfied the requirements of Notice 2006-52, section 4.05. Accordingly, we conclude that the field inspection and certification of the field inspection satisfied the requirements of Notice 2006-52, section 4.05.

On the basis of the foregoing, we conclude that the certification of compliance and the notice to building owner in this case satisfied the requirements of section 179D(c)(1) and Notice 2006-52, section 4.

B. *Allocation of the Section 179D Deduction to Edwards*

Government entities, which do not benefit from tax deductions, are allowed to allocate the section 179D deduction "to the person primarily responsible for designing the property in lieu of the owner of such property." § 179D(d)(4); *see also United States v. Quebe*, No. 3:15-cv-294, 2019 WL 330852, at *4 (S.D. Ohio Jan. 25, 2019). The Secretary has not "promulgated a regulation to allow the allocation of the [section 179D] deduction," as directed by section 179D(d)(4). Notice 2008-40, however, sets forth interim guidance on the requirements for the allocation of the section 179D deduction with respect to government-owned buildings. *See* Notice 2008-40, § 3, 2008-1 C.B. at 725.

Respondent argues that Edwards could not be allocated the section 179D deduction because it was not the person primarily

responsible for designing the property installed in Building 200. Respondent further argues that, even if Edwards were the person primarily responsible for designing the property, Hines VA did not properly allocate the section 179D deduction to Edwards because the allocation letter does not conform to the requirements of Notice 2008-40, section 3.04. We disagree with respondent on both grounds.

1. *Person Primarily Responsible for Designing the Property*

Section 179D does not define the "person primarily responsible for designing the property." Notice 2008-40, section 3.02, however, defines a "designer" as "a person that creates the technical specifications for installation of [EECBP]" and may include, for example, an architect, engineer, contractor, environmental consultant or energy services provider who creates the technical specifications for a new building or any addition to an existing building that incorporates energy efficient commercial building property. Notice 2008-40, § 3.02. Section 3.02 further clarifies that "[a] person that merely installs, repairs, or maintains the property is not a designer." *Id.*

Relying on Notice 2008-40, respondent argues that Edwards was not a "designer" of the EECBP installed in Building 200 because it did not create any technical specification for the installation of the property and the scope of its work was limited to installing, repairing, or maintaining the HVAC systems. Respondent thus contends that Edwards is not eligible to be allocated the section 179D deduction. We disagree.

We find that the work Edwards performed with respect to the projects at issue involved more than mere installation, repair, or maintenance. The statement of work for both the S4/S5 air handling units project and the emergency temperature control system project called for Edwards to replace the existing American Auto-Matrix control systems and install new Johnson Controls building automation systems. In order to install the new Johnson control systems, Edwards analyzed the original sequence of operations to determine how the existing systems were intended to operate, inspected the existing systems to determine how they were actually operating in comparison to the original sequence of operations (i.e., to identify any failures or ad hoc changes made to the original sequence of operations), and modified or changed the sequence of operations as necessary to better operate the systems. Mr. Carpenter and Mr. Moravec programmed the modified

sequence of operations into the new Johnson control system. Mr. Carpenter then conducted simulation tests on every aspect of the system and reprogrammed any aspects of the system not found to be within specifications. We conclude that, in modifying the sequence of operations to better operate the systems and programming the modified sequence of operations into the new Johnson control systems, Edwards created the technical specifications for the installation of the EECBP at issue. On the basis of the foregoing, we conclude that Edwards was a "designer" within the meaning of Notice 2008-40, section 3.02 for the projects at issue.

Respondent further argues that South Side, and not Edwards, was the person primarily responsible for designing the property installed in Building 200. Respondent asserts that South Side devoted significant time to designing the property, performed engineering services in connection with the installation of the property, programmed the control systems, and created all the drawings used by Edwards to install the control systems in Building 200. Respondent further asserts that the engineering work South Side performed accounted for more than half of the costs Edwards incurred with respect to the projects. Thus, respondent asserts that only South Side may be allocated the section 179D deduction.

We find that respondent is overstating the role that South Side played with respect to the EECBP installed in Building 200. South Side is a control and parts distributor for commercial HVAC contractors and is primarily in the business of selling replacement parts and components for commercial HVAC systems. South Side is not an architecture firm and does not employ any licensed engineers. Most of the amount Edwards paid to South Side with respect to the projects at issue was for the control systems equipment and components. Moreover, a representative of South Side testified that South Side's role in projects is typically to implement the contractor's design for an HVAC system by doing the technical programming of the system. While South Side also assisted in the technical programming of the controls and created drawings with respect to the projects, South Side was merely a subcontractor acting at the direction of Edwards and implementing Edwards's design. Furthermore, neither section 179D nor Notice 2008-40 prohibits the use of a subcontractor.

Assuming arguendo that both Edwards and South Side were "designer[s]" of the EECBP installed in Building 200, Notice 2008-40 gives the building owner the discretion on how to allocate the section

179D deduction. Notice 2008-40, section 3.01, provides that the building owner "may allocate the § 179D deduction to . . . the designer." Notice 2008-40, section 3.03 states that if there is "more than one designer. . . the owner of the building shall (1) determine which designer is primarily responsible and allocate the full deduction to that designer, or (2) at the owner's discretion, allocate the deduction among several designers." Pursuant to the allocation letter in this case, Hines VA allocated the full amount of the section 179D deduction to Edwards. Thus, absent any evidence to the contrary, we conclude that Hines VA determined Edwards to be the person primarily responsible for designing the EECBP installed in Building 200. Accordingly, we find that Edwards was the person primarily responsible for designing the EECBP installed in Building 200.

### 2. *Form of Allocation*

Section 179D does not prescribe any particular formal requirements for the allocation of the deduction. Notice 2008-40, section 3.05, 2008-1 C.B. at 726, however, states that "[b]efore a designer may claim the § 179D deduction with respect to property installed on or in a government-owned building, the designer must obtain the written allocation described in section 3.04." Pursuant to Notice 2008-40, section 3.04, an allocation of the section 179D deduction will be treated as satisfying the requirements of this section if the allocation contains, inter alia:

(4) The cost of the property;

(5) The date the property is placed in service;

(6) The amount of the § 179D deduction allocated to the designer; [and]

(7) The signatures of the authorized representatives of both the owner of the government-owned building and the designer or the designer's authorized representative.

Alliantgroup prepared and drafted the allocation letter Edwards obtained in this case. On November 15, 2013, petitioner Michael Johnson signed the allocation letter on behalf of Edwards and, on December 17, 2013, Mr. McCrary signed the allocation letter on behalf of Hines VA. The allocation letter stated, in relevant part, that "the owner of the Building allocates the full federal income tax deduction available under Section 179D attributable to the HVAC and hot water

systems to Edwards Engineering, Inc., for their work on the Building." Attached to the allocation letter was a table which showed, inter alia, the placed in service date and the cost of the property installed in Building 200 with respect to the projects at issue.

Respondent argues that the allocation letter does not conform to the requirements of Notice 2008-40, section 3.04, because it does not state the dollar amount of the deduction allocated to Edwards. Respondent asserts that such a requirement is necessary for building owners to be able to calculate the aggregate amount of deductions taken with respect to a building for purposes of future allocations. We disagree.

Notice 2008-40, section 3.04, requires the allocation letter to state only the "amount" of the section 179D deduction allocated to the designer. We find that the allocation letter Edwards obtained from Hines VA did include the "amount" of the section 179D deduction allocated to Edwards. Pursuant to the allocation letter, Edwards was allocated the full amount (i.e., 100%) of the section 179D deduction with respect to Building 200. If Notice 2008-40 required the allocation letter to state the "dollar amount" of the allocation, then it would have so stated. Moreover, Hines VA was issued a notice to building owner, dated August 11, 2014, which informed it of the dollar amount of the section 179D deduction Edwards claimed. Thus, in any event, Hines VA was provided the information necessary to account for any future section 179D allocations with respect to Building 200.

Next, respondent argues that the allocation letter does not conform to the requirements of Notice 2008-40, section 3.04 because it was not signed by an "authorized representative" who had actual authority to bind Hines VA. We disagree. As mentioned above, Mr. McCrary signed the allocation letter on behalf of Hines VA. During 2013 and 2014 Mr. McCrary was the Chief of Maintenance and Operations and a contracting officer's representative at Hines VA. At trial Mr. McCrary testified that at the time he signed the allocation letter, he believed he had "the authority to sign" the document on behalf of Hines VA. Mr. McCrary, however, further testified that he does not have the authority to execute contracts on behalf of Hines VA. As an initial matter, the allocation of the section 179D deduction in this case does not appear to constitute a contract. *See, e.g., United States v. Stump Home Specialties Mfg., Inc.*, 905 F.2d 1117, 1121–22 (7th Cir. 1990) (describing the preexisting duty rule). Furthermore, the record is devoid of any evidence indicating that Hines VA has attempted to reverse or

invalidate the allocation of the section 179D deduction to Edwards on the basis of any purported lack of authority. Accordingly, on the basis of the record before us, we find that the allocation letter was signed by an authorized representative of Hines VA.

On the basis of the foregoing, we conclude that the allocation letter Edwards obtained from Hines VA with respect to the EECBP installed in Building 200 satisfied the requirements of section 179D(d)(4) and Notice 2008-40.

C.      *Whether the EECBP Was Placed in Service in 2013*

Section 179D allows a deduction for "the cost of energy efficient commercial building property placed in service during the taxable year." § 179D(a). Consistent with the statute, Notice 2008-40, section 3.01 states that "[t]he deduction will be allowed to the designer for the taxable year that includes the date on which the property is placed in service."

Section 179D does not define when EECBP is "placed in service." However, because EECBP is property "with respect to which depreciation . . . is allowable," we turn to the statutes and rules governing depreciable property to determine when property is "placed in service" for section 179D purposes. §§ 179D(c)(1)(A), 179(a), 167; *see Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993) (interpreting tax statute in light of presumption that Congress was aware of settled meaning of term of art used); *Sorenson v. Sec'y of Treas.*, 475 U.S. 851, 860 (1986) (applying canon that "identical words used in different parts of the same act are intended to have the same meaning"). Section 167 allows a depreciation deduction for the exhaustion, wear and tear, or obsolescence of property used in a trade or business. Treasury Regulation § 1.167(a)-10(b) provides that "[t]he period for depreciation of an asset shall begin when the asset is placed in service." In general, property is placed in service when it is "first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Treas. Reg. §§ 1.167(a)-11(e)(1)(i), 1.179-4(e). Property is thus deemed to have been placed in service at the time when it functionally could have been used, rather than when it was actually used. *See Waddell v. Commissioner*, 86 T.C. 848, 897 (1986), *aff'd*, 841 F.2d 264 (9th Cir. 1988); *Piggly Wiggly S., Inc. v. Commissioner*, 84 T.C. 739, 746–47 (1985), *aff'd*, 803 F.2d 1572 (11th Cir. 1986).

The parties agree that the specifically assigned function of the EECBP (i.e., the control systems) Edwards installed in Building 200 was to operate the various components of the HVAC system to heat and cool the premises. Petitioners assert that the property Edwards installed in Building 200 was placed in service during the 2013 taxable year. In contrast, respondent argues that the control systems could not be ready and available for their specifically assigned function in 2013 because (1) South Side did not supply the Johnson controls to Edwards until 2014, (2) Edwards employees logged hours in 2014 related to the installation and programming of the control systems, and (3) Edwards admitted in correspondence sent in 2014 that the projects were not yet finished. Thus, respondent contends that the EECBP was not placed in service during the 2013 taxable year.

We are not persuaded by the evidence respondent relies on to support his position. Respondent relies on several invoices created by South Side to support his assertion that certain controls were not supplied to Edwards until 2014. However, an employee of South Side testified at trial that those invoices were not issued to clients but rather were created for the purpose of tracking inventory, which is why the invoices reflect a zero balance owing. With respect to the hours logged in 2014, Edwards employees credibly testified that the work entries shown for Building 200 in 2014 were related to "warranty, fine-tuning, and callbacks." Lastly, although an email in 2014 generally indicates that the emergency temperature control project may not have been finished, it does not rebut testimony offered by petitioners that the remaining work related to warranty, fine-tuning, and callbacks. *See Sealy Power, Ltd. v. Commissioner*, 46 F.3d 382, 394 (5th Cir. 1995) (observing that testing property for potentially defective performance does not preclude property's having already been placed in service), *aff'g in part*, *rev'g in part* T.C. Memo. 1992-168.

On the other hand, there is substantial evidence in the record indicating that the EECBP Edwards installed in Building 200 was placed in service during the 2013 taxable year. The allocation letter, which was signed by Mr. McCrary, states that the property installed for the S4/S5 air handling units projects was placed in service in November 2013 and the property installed for the emergency temperature control systems project was placed in service in December 2013. Mr. McCrary further testified at trial that he believed the file reference to those placed in service dates to be accurate. Moreover, Mr. Paul and Mr. Carpenter, the Edwards employees primarily responsible for providing services for the projects at Hines VA, testified that the projects were completed and

operational in 2013. Thus, all persons with firsthand knowledge agree that the projects were completed and the EECBP's was operational in 2013. Furthermore, Mr. Paul testified that Edwards typically sends invoices within 30 to 45 days after a project is completed. Consistent with the EECBP's being placed in service during the 2013 taxable year, Edwards issued to the VA invoices for the S4/S5 air handling units project and the emergency temperature control systems project on January 31, 2014. On the basis of the foregoing, we conclude that the EECBP Edwards installed in Building 200 for the projects at issue was placed in service during the 2013 taxable year.

## D. *Amount of the Section 179D Deduction*

Under section 179D(a) the amount of the deduction allowed is "equal to the cost of energy efficient commercial building property placed in service during the taxable year." Section 179D(b), however, limits the deduction allowed with respect to any building for any taxable year to the excess (if any) of the product of $1.80 and the square footage of the building, over the aggregate amount of section 179D deductions taken with respect to the building for all prior taxable years. Thus, the amount of the section 179D deduction allowed is equal to the lesser of (1) the cost of EECBP placed in service during the taxable year and (2) the maximum amount of deduction determined under section 179D(b).

Hines VA allocated to Edwards the full amount of the section 179D deduction with respect to the EECBP installed in Building 200. Edwards claimed a section 179D deduction of $1,073,237 for the 2013 taxable year, which is equal to the product of $1.80 and 596,243, the square footage of Building 200. There is no indication in the record that any section 179D deductions have been taken with respect to Building 200 for any prior taxable years.

Respondent contends that Edwards overstated the amount of the section 179D deduction because the cost of property does not exceed $304,640, the total amount Edwards billed to Hines VA for Building 200. Respondent further argues that the total amount invoiced also included costs Edwards incurred in 2014, which would necessarily be excluded from the cost of property placed in service in 2013. Thus, respondent asserts that the amount of the section 179D deduction allowed must be less than $304,640.

Petitioners, on the other hand, contend that the cost of property in these cases does not limit the amount of deduction because it far

exceeds the section 179D deduction Edwards claimed. Citing section 179D(d)(4), petitioners argue that, upon allocation of the section 179D deduction, Edwards stands in the shoes of Hines VA for purposes of determining the cost of property. *See* § 179D(d)(4) ("Such person shall be treated as the taxpayer for purposes of this section."). Thus, petitioners argue that the cost of property consists of the total expenditures Hines VA made with respect to property installed in Building 200, which includes not only the amounts paid to Edwards but also the amounts previously paid to other contractors for the HVAC upgrade work from 2010 through 2012. Petitioners assert that, because Hines VA's contract with the contractor hired for the original HVAC upgrade work was for $4,975,000 alone, the cost of property far exceeds the section 179D deduction Edwards claimed for the 2013 taxable year.

We need not decide what the term "cost" means generally for purposes of section 179D. Whatever the meaning of that term more broadly, under section 179D(a), the amount of the deduction allowed for a given taxable year is equal to the "cost of [EECBP] placed in service during the taxable year." Petitioners do not allege, and the record does not indicate, that any of the property installed in Building 200 as part of the original HVAC upgrade work was placed in service during the 2013 taxable year. In fact, the contract progress report petitioners submitted as evidence of the cost of the original HVAC upgrade states that the work on that project was 98% complete as of June 2011. Moreover, Mr. Paul represented in his testimony at trial that, at the time Edwards began performing services under the maintenance contract in 2012, the existing HVAC system was in place and operational. Thus, the property installed in Building 200 as part of the original HVAC upgrade does not constitute EECBP "placed in service" during the 2013 taxable year.

However, as we concluded above, the EECBP that Edwards installed in Building 200 with respect to the projects at issue in these cases was placed in service during the 2013 taxable year. Thus, the cost of that property is included in determining the cost of property under section 179D(a). Hines VA paid Edwards a total of $304,640 for the EECBP installed in Building 200 in 2013. Accordingly, we conclude that the cost of the EECBP placed in service during the 2013 taxable year in Building 200 is $304,640.

Since the cost of the EECBP to Hines VA does not exceed the maximum amount of deduction determined under section 179D(b), the amount of the section 179D deduction allowed is limited to the cost of

the EECBP. *See* Notice 2008-40, § 3.06. Pursuant to section 179D(d)(4), Hines VA allocated to Edwards "the full federal income tax deduction available under section 179D" for the EECBP installed in Building 200 in 2013. Accordingly, we conclude that the amount of the section 179D deduction Edwards is entitled to for the 2013 taxable year is $304,640.

VIII.  *Conclusion*

On the basis of the foregoing, we conclude that Edwards is entitled to a section 179D deduction of $304,640 for the 2013 taxable year. In reaching our holdings, we have considered all arguments made by the parties and, to the extent not discussed above, we consider those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*